The next case scheduled for argument this morning, Wednesday, March 26, 2014, is Case Number 13-6061, Inc. v. Robert L. Fields, Community Financial Group Inc. v. Robert L. Fields Robert Fields, Community Financial Group, Inc. v. Robert L. Fields, Community Financial Group, Inc. v. Robert L. Fields Good morning, gentlemen. Mr. Bruzek, if you would, please. Robert Fields, Community Financial Group, Inc. v. Robert L. Fields Good morning, Your Honors. Robert Fields is appealing the Bankruptcy Court decision that he has a liability under Section 523a-2a of the Bankruptcy Code regarding the loan that was taken out by his company, MainStreetOtsego, from Community Finance Group. A little background. Mr. Fields was the Chief Executive Officer of MainStreetOtsego. In late 2008, MainStreetOtsego was suffering financial difficulties and sought a short-term loan for its business activities. Mr. Fields approached Andrew Vilenchek, who is the main actor on behalf of Community Finance Group. At that first meeting, the parties discussed the particulars of a loan and the particulars of what Mr. Vilenchek would need from Mr. Fields in order to provide this loan and also discussed other items and parameters of the loan, including the amounts. From that point, the discussion and the parties' versions of the facts differ, and it's important that I briefly touch on them. First, after the parties met, there was a second meeting at Mr. Vilenchek's office where a one Dwayne Koprensky was present during this conversation. During this conversation, Mr. Fields had testified that he had instructed Mr. Vilenchek that he needed funds in order to bring his mortgages current on the properties for MainStreetOtsego in order to restructure or refinance the deal. Mr. Vilenchek's version of the facts is that he was informed by Mr. Fields that he needed to complete tenant improvements on this property in order for the first mortgage lender to free up some funds in order for the project to go along and, more importantly, in order for Mr. Vilenchek and CFG to be paid outside of these funds. And after that meeting, Mr. Vilenchek took certain steps to investigate and some due diligence regarding the property. Mr. Vilenchek did a site inspection of the property. Mr. Vilenchek pulled a title report, which clearly had the terms of the underlying first mortgage, which were already in default by the terms of the mortgage. The maturity date on the mortgage that was of record was a year before the meetings between Mr. Vilenchek and Mr. Fields. Mr. Vilenchek also asked for a credit report and an application from Mr. Fields because that's what Mr. Vilenchek testified, that he required all borrowers to complete an application and a credit check. Mr. Fields never did complete the application process. Is there anythingóis the application itself in the record? The application was not in the record becauseó So we don't know if there would have been anything in the application that would have tipped Mr. Vilenchek off one way or another. We don't know one way or the other because it would be just a blank application. So what you're arguing basically is he said he required this and then he ended up doing the loan without requiring the application be submitted. Exactly. And during these initial conversations, Mr. Vilenchek also stated that he will not take a second position mortgage on a piece of property and that he also would want, if tenant improvements were needed, he also would like to do a construction loan, which in normal parlance is the lender controls the disbursements as the project's completed in order to ensure that those completionsóthose improvements are done and, more importantly, paid for. After that meeting, Mr. Fields provided numerous information and financials regarding his related entities to Mr. Vilenchek. Mr. Vilenchek completed his own title work and his testimony stated that he found out that there were about $90,000 in unpaid real estate taxes and that those needed to be corrected and paid before the loan would be financed. Weren't those ultimately paid from the loan proceeds? Those were ultimately paid from the loan proceeds. So all this is a backdrop. As the loan ultimately was funded and Mr. Fields took those funds and used $335,000 of them to pay the first mortgage and used $93,000 to pay the unpaid property taxes, there was an amount that came to the lender as points and then the remaining was used for funds which weren't really described at trial. Under those circumstances, the bankruptcy court determined that Mr. Fields had liability under 523A2A because his version of the facts that he told Mr. Vilenchek that the funds were going to be used not for tenant improvements but for curing the first mortgage payments and that Mr. Vilenchek's versions of the stories were true. We believe the court committed a reversible error regarding the elements under 523A2. The first reason that the court committed clear reversible error is that the facts as outlined by Mr. Vilenchek could not possibly have been true. At first, the trial court disregarded the testimony of Dennis Krupinski and while it is in the trial court's province to give credibility to testimony, the memorandum opinion clearly and erroneously describes what Mr. Krupinski testified to. The trial court held that Mr. Krupinski's testimony didn't corroborate anything because his testimony was that he witnessed what Mr. Fields had told Krupinski. Well, Mr. Krupinski's testimony was in fact much different than that. Mr. Krupinski testified that he heard and was present when Mr. Fields told Mr. Vilenchek what the purpose and the use of the funds. Well, he didn't quite say it as clearly as you did. He said, to the best of my recollection, which for a yes and no question, isn't that kind of problematic? Either he remembered or he didn't, and to qualify it with to the best of my recollection sounds a little wiggly. Was the bankruptcy court wrong to interpret it just that way? I think the bankruptcy court was wrong to interpret it as he stated that he only heard what Mr. Fields had told him, not what Mr. Fields had told Mr. Vilenchek. The second reason why we think that these statements are not actionable is because they relate to a future conduct and to Fields' financial condition. Under Bankruptcy Code, any statements under 523A that are actionable must relate to a past or present fact. In this case, the statements, even if we take Mr. Vilenchek's position as true, relate to future conduct, and the future conduct is related on contingent events of third parties. Excuse me again, but isn't a statement of a party's intent a statement of a present fact? If I represent to you that I intend to do something, knowing at the same time that I do not intend to do it, isn't that a statement of present fact? In a particular case where you do not, where a party does not intend to complete the act in which future conduct, which it's- And isn't that arguably the case here? I mean, accepting the bankruptcy court's interpretation of the facts, debtor never intended to use the money for tenant improvements. Debtor intended to use the money to stave off its primary lender, again, according to what the bankruptcy court felt. So that's a statement of present fact, is it not? If, in fact, the bankruptcy court's interpretation is correct. Well, and the statement, I think, goes to Mr. Vilenchek's testimony was he believed that the tenant improvements were going to be used, and then the lender was going to provide or release additional funding in order to pay him back. And the argument is that that is all a future conduct that's contingent upon this lender that's already frozen up funds. But wasn't the misrepresentation related to what the debtor intended to use the funds for? That's- In the hope that there would be refinancing down the road if he was successful. And that is Mr. Vilenchek's version. Correct. And that's what the court found. That's what the court found. That's the bankruptcy court's- So isn't that a statement of a present intent? And this is just a follow-up. Isn't that a statement of the debtor's present intent of what he intended to use the funds for? Yes, which was to obtain additional financing. And he, in fact- Which was to use the funds for tenant improvements in the hope that that would lead to additional financing. He wasn't representing there would be additional financing, as I understand it. He was representing that there could be if the tenant improvements were made and the place were leased up. That is Mr. Vilenchek's version, what the bankruptcy court held. Found. Yes. But he- But Mr. Fields and the appellant in this, you know, his statements were that he had disclosed these fully to Mr. Vilenchek. And there was, we believe, corroborating evidence, which we asked this court to rule that there was a clear error that the bankruptcy court disregarded. The second reason why these statements are not actionable is that statements related to financial condition that are made orally are not actionable. The trial court held pretty specifically that the specific financial stresses on the MSO development that required near-term remediation, if the project was to stay whole under MSO and a prospective short-term lender would be repaid in its own right. The court further went, the defendant's representations as to the needs prompting MSO's loan application and the purposes for which the funds would be applied. It seems clear that the trial court took all of Mr. Fields' statements as made to Mr. Vilenchek as a ruse in order to obtain funds based on the financial condition of Main Street Otsego at that time. And under Field v. Manns, the, you know, Supreme Court had discussed what is, briefly, what is a statement of financial condition and what is just a statement of fact. And it seems to me in reading the trial court's order that it clearly held that this was, what they were describing were misrepresentations related to a financial condition of the overall financial health, net worth, or ability to generate income. Let me jump in again, because as I read the opinion, I mean, it's, certainly there's 48 pages and there's a lot of things in that 48 pages. But the single representation that seems to have, or alleged misrepresentation that seems to have survived, is the representation that the loan would be used for tenant alterations. That's what everything, when we sift everything through, that's the representation on which the court premised its decision. That's not a statement of financial condition, is it? That is not a statement of financial condition taken by itself. If it's added to Mr. Vilenchak's version of the tenant improvements will be completed and Mr. Fields will be able to, or MSO, will be able to obtain more funds in order to repay him because the first lender has already frozen its line of credit to him. It seems to me that that could bring it into the picture of a financial condition, the overflight condition. Okay, but I don't want us to lose focus on the fact that the bankruptcy court focused on one representation and everything else it was weeding out, it was throwing this out, it was saying this didn't count. It focused on that one statement, and that statement is not financial condition, correct? You'd agree with that? I would agree that just in the tenant improvement. Okay. The purpose is we can use it. Finally, and I think the most important issue at this case is reliance. The court took a lengthy part of its decision to differentiate the difference between justifiable reliance and reasonable reliance. And we think in this case that the court committed clear error by determining that Mr. Vilenchak acted justifiable under the circumstances. Justifiable reliance is the quality and characteristics of the particular party with the circumstances as well, and it also has to take into account the special knowledge and competence of the particular lender or the particular person. In this case, we have an experienced lender who was college educated, who owned his own title company, who was experienced in the construction trade, who was experienced in being able to estimate what improvement instruction costs would take in a remodeling project. And with all of this, there's a heightened sense of reliance, and I think that is the justifiable reliance. It's clearly met in this case. What were the red flags? Well, I think the first red flag is that Mr. Fields originally asked for $500,000 for a loan for tenant improvements. And the facts after that clearly show that that couldn't have been true because if he needed $500,000 to complete tenant improvements, how would he do that if he was only going to net $393,000 to complete those tenant improvements? And I think that's one red flag.  You don't think it was prudent to pay the real estate taxes if you're a second lender? It may have been prudent under the circumstances. I'm sorry, tell me the other reasonable reliance problems, justifiable reliance. The other justifiable reliance problems is Mr. Fields already had his credit frozen. Mr. Fields was crying with tears in his eyes that he really needed this loan and that he also was, you know, he showed numerous losses on his financial statements. It all shows that he just, there's enough red flags here that the loan shouldn't have been given or that, more importantly, when it comes to completing these tenant improvements, that Mr. Vilancak did not require a construction loan, which he at his first instance had stated that he would like to do it that way. And I think all these reasons show why, and as in the brief, why their justifiable reliance was not met. And I see that my time is up. Thank you. Thank you. Mr. Parker. Good morning. Good morning. May it please the Court, Counsel. Thank you. In looking back in this case, and we had over two days' worth of testimony and ten witnesses, I think it's really a simple case. It's an issue of whether or not the policies of this court allow debtors to obtain discharge by defrauding or over debt that they've obtained by defrauding a creditor. And I thought that the policies of this court are very simple, that the discharge is allowed to an honest but unfortunate debtor. Which begs the question, what was the plaintiff in this . . . what was the defendant in this case, the honest but unfortunate debtor or the defrauding creditor . . . defrauding debtor? That kind of begs the question. I think the court accurately found, and I didn't hear anything this morning from counsel for Mr. Fields that indicated clear error on the part of the trial court that in fact that this debtor was not honest. And the fact . . . all you have to do is look at the testimony of his own people that worked side by side with him and the level of disclosure that he made to them with respect to the default notices, the forbearance agreements, the steps he was taking to obtain loans and really the status of the company. Because they all testified that he had ultimate control in the final say in all of these financial decisions, including the provision of any financial related documentation to creditors. And as you probably recall from the testimony, there was quite a bit of discussion about bank books and which bank books were provided to different lenders, in particular community finance groups. If the misrepresentation related to the use of funds, which is what the court found, the intended use of the funds, shouldn't Mr. Vilenchek have known by the time he got to closing that the funds were going to be used to pay . . . to make back payments on the loan and not to make tenant improvements? And, Your Honor, if I may ask you a question, how would he have known that? Well, there was . . . At least on the record that . . . By the time of closing, there was the action of the governor that document, I think it was Exhibit 25, or maybe it was 36, which indicated the use of the funds, I believe, did it not? No. There was no indication prior to or within several days post-closing. In fact, if you look at the communications from Mr. Fields to GCI, he even indicates, I obtained investor funds. I finally got that investor to come in, and here I'm making the payment. And if you look at the testimony of Mr. Earhart, who is the president of GCI, what does he say? CFG was never disclosed to us, number one. CFG could not have obtained the information regarding the default notices or the forbearance agreement in any public forum. And number two, we would not have been able to disclose any of the information related to that. What about the fact that the $500,000 wasn't being used for tenant improvements because some was being used to pay real estate taxes and et cetera? That's exactly the point. Why it was used to pay real estate taxes also ties into the fact that CFG did not know of the need to use the funds to pay interest and penalties to GCI because they would have withheld those funds and paid them directly out of closing to GCI, just like they paid the real estate taxes. They wanted to make sure that their second position was clean. So if Mr. Fields would have disclosed, everybody in this room has been through a real estate transaction, I'm presuming. So when there are debts owing and disclosed, those go on a closing statement. And then the closing company pays those debts right out of closing. What about Mr. Bruzek's bringing to our attention that had the creditor gone to the recorder's office, which it did, it would have seen that the maturity date for the first mortgage was passed or maturity had already passed so that the loan was either in default so that the loan had to be known to be in default? The loan was extended and there was forbearance agreements, so there was nothing in the public record to indicate any kind of default. And the representation that Mr. Fields made was that he needed a bridge loan. But the due date of the loan had already passed. Right, but you wouldn't record a new mortgage. You wouldn't record the forbearance agreement either, would you? No, no. So you could have a mortgage and you could have extensions on that mortgage. The creditor is not going to keep recording the mortgage. They would just amend a promissory note, for instance, and put it in their files. That's why if you look at the testimony of Mr. Learhart, who's the president of GCI, I think it's very clear as to what was and wasn't available in the public record. I think the most important thing is that if any one of us go to a bank to obtain finances, aren't we under a duty to disclose all material facts? That's what this case is really about. I'm not even sure why we're stuck on one misrepresentation or another. The common law, going back hundreds of years, defines fraud by both misrepresentation and omission. Section 523A28 takes the same approach. It allows for an exception to discharge for false pretenses, deception, actual fraud. What's comprised of deception or actual fraud, that's both affirmative misrepresentations of material facts, just like omissions. So to me, it's a very simple discussion. Could Mr. Fields disclose the totality of his circumstances? The answer is yes. And the fact that he didn't disclose them to our client and didn't disclose them to his own people or the lender that he was working with is what led to this debt deemed not to be dischargeable. Well, quickly though, again, as I said to Mr. Bruzek, you need to focus because the bankruptcy court was relying on one representation, and there was not a cross appeal taken from any of the other findings that the other statements or the other documents didn't come into play. So on this appeal, what we're looking at is that representation and whether it falls within the statute. All this other stuff is puffery because none of it was appealed, and the bankruptcy court made its findings that this was the statement that we have to deal with. I'm going to go quickly back to what Judge Fetterman was asking earlier because in appellant's brief, appellant states, at closing, Velenchik was provided with MSO, written action of the governor, stating clearly that the $500,000 loan was to help MSO refinance, and it stated nothing with regard to tenant improvements. That's Trial Exhibit 36. Are you saying that's not true, that that wasn't presented at closing? Because there's testimony from someone, as I recall, that I think your client reviewed it and then tried to explain what he understood refinance meant. But are you saying that that was not presented at closing? Well, I guess I'm confused as to what the documents were. We submitted all of the documents into evidence that were presented at closing. There was no document at closing that identified how the proceeds were to be distributed other than the closing statement, which provided . . . So Trial Exhibit 36 doesn't say what appellant is saying that it says? Not that I have seen. In other words, at no time up until really the litigation was any information provided to GCFG related to the use of the proceeds other than what the court had found. And Trial Exhibit 36 was your exhibit? That was part of the package that you presented? I believe so, Your Honor. Okay. I know we presented . . . we went through at least forty exhibits with Mr. Fields and that's another thing that I'd like the court to note, is that the trial court specifically asked for case law and the finding of credibility of testimony. And the reason the court did that is that Mr. Fields testified twice. And if you look at his testimony when I called him on cross-examination versus his testimony on direct from Mr. Buzak, you'll see that the two testimonies are inconsistent. And one particular issue is the testimony regarding Mr. Kropensky that the counsel was bringing up. Mr. Fields, when I was questioning him, did not discuss a meeting with him and Mr. Kropensky and Mr. Valenchik. And for that reason, the court did not place the value of Mr. Kropensky's testimony because he didn't have any specific recollections, Your Honor noted, and it also was not consistent with Fields' initial testimony. So he described . . . I asked him specifically to describe when he met, how many times he met with Mr. Valenchik and representatives of CFG. That testimony in the initial hearing . . . in the first date of trial was inconsistent from the subsequent ones. And then we went through it again with him. So if you look . . . that's why we have a rather lengthy opinion. I think the judge analyzed all of the various discrepancies. And to your point, the finding is, as Your Honor is indicating, but since we do have a forty-eight page opinion, I think the judge addresses the various omissions and the totality of the circumstances which led to his final conclusions. And I don't think that the court can simply disregard those conclusions and findings as we're looking for clear error on the part of the court. So I think to properly analyze the opinion and to make a determination of clear error, you have to look at the opinion in its totality and the findings contained therein. May I address any other questions? I don't want to go back through the opinion other than really to note . . . And I see that I have about four minutes left, but . . . You don't have to use it if you want to. There's no penalty. I just wanted to direct the Court's attention to really page 21 of our brief where we cite the various analogous case law where the debtor of certain debtors was found to be non-dischargeable for providing false or incomplete information to lenders where there was deceit or some kind of trick involved. But that goes to what Judge Nail suggested, which is this case is based on a single representation, it seems to me, the use of the loan proceeds. And that was a significant misrepresentation. And I think when you take that in the totality of the testimony of the witnesses and the entirety of the findings, then you have the basis for the fraud which the court found. So we would respectfully request that this Court uphold the lower court's opinion. Thank you for your time this morning. Thank you.